UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FELICIA ALFORD,

      Plaintiff,

v.                                    Case No. 8:25-cv-94-VMC-SPF

PASCO-PINELLAS HILLSBOROUGH
COMMUNITY HEALTH SYSTEM, INC.
d/b/a ADVENTHEALTH WESLEY
CHAPEL,

      Defendant.
_____/

**ORDER**

This matter is before the Court on consideration of Defendant Pasco-Pinellas Hillsborough Community Health System, Inc.'s ("AdventHealth") Motion for Summary Judgment (Doc. # 72), filed on March 9, 2026. Plaintiff Felicia Alford responded on April 16, 2026 (Doc. # 80), AdventHealth filed a reply on April 30, 2026 (Doc. # 84), and Ms. Alford filed a sur-reply, with leave of Court, on May 8, 2026. (Doc. # 87). For the reasons that follow, the Motion is granted.

I.   **Background**:

A.   **The Parties**

According to the complaint, Ms. Alford is a Black woman. (Doc. # 45 at ¶ 3). Ms. Alford worked as a "PRN Social Work Care Manager" at AdventHealth's hospital in Wesley Chapel from February 2021 until her termination in June 2024. (Doc.

1

# 72-2 at 23:2-9, 186:11-2; Doc. # 72-20 at ¶ 5; Doc. # 72-21 at ¶ 1). Ms. Alford's immediate supervisor was Sheila Hammond. (Doc. # 72-21 at ¶ 9). AdventHealth's Director of Care Management, Jennifer Iglesias, was Ms. Alford's second-level manager. (Id. at ¶¶ 2-3).

### B.    AdventHealth's Policies

AdventHealth's Rules of Conduct require employees "to observe all AdventHealth's rules, policies, and procedures." (Doc. # 72-20 at ¶ 7). Employees "can face discipline and termination for insubordination, disrespectful behavior, failure to follow a supervisor's instructions or to perform assigned work, or poor performance." (Id.). "Pursuant to its Corrective Action Policy, AdventHealth has discretion to administer any level of discipline to correct violations or performance concerns, and disciplinary steps may include a Documented Discussion, a Written Warning, a Final Warning, and termination, in any order." (Id. at ¶ 8).

"PRN means *pro re nata*, or 'as needed' or 'when necessary.'" (Doc. # 72-21 at ¶ 4). A PRN employee "is not guaranteed shifts and may not always get her preferred shifts." (Id. at ¶ 29). It is undisputed that, pursuant to AdventHealth's written Policy CW HR 244, PRN employees are required to "be available to work" at least four shifts per month. (Doc. # 75-12 at 1). But the parties disagree as to

2

what being "available to work" means. According to AdventHealth, PRN employees "are required to work at least four shifts per month . . . in order to maintain their PRN status." (Doc. # 72-21 at ¶ 29; Doc. # 72-22 at ¶ 11). At her deposition, Ms. Alford initially agreed that PRN employees had to work "[f]our shifts per month." (Doc. # 72-2 at 90:7-10). However, Ms. Alford later testified that Policy CW HR 244 merely required PRN employees to submit four days in which they were available to work during a month. (Id. at 235:12-237:13). According to Ms. Alford, if she was not scheduled on the dates she submitted, she did not have to pick up any additional shifts offered to her to satisfy the four-shifts-per-month requirement. (Id. at 236:19-237:13, 267:4-7, 268:16-24). However, Ms. Alford did not dispute that, regardless of the language of Policy CW HR 244, AdventHealth required PRN employees to work four shifts per month. See (Id. at 306:13-23) (acknowledging that AdventHealth terminated her for failing to comply with its requirement that PRN employees work four shifts per month).

### C.   Ms. Alford's Tenure at AdventHealth

Ms. Alford had various documented performance issues while working for AdventHealth. In July 2021, Ms. Alford received a written "corrective action" after she failed to report for a scheduled shift and did not secure coverage.

3

(Doc. # 72-9 at 1; Doc. # 72-21 at ¶¶ 6-8). On May 24, 2022, Ms. Alford told Ms. Iglesias that she needed to leave early to take her father to a doctor's appointment. (Doc. # 72-21 at ¶ 10). The situation became tense when Ms. Iglesias told Ms. Alford that "there was no coverage that we could arrange last minute," and Ms. Alford ultimately left without securing coverage. (Id. at ¶¶ 10, 12). On June 22, 2022, Ms. Alford complained to HR that Ms. Iglesias was bullying and retaliating against her, but did not identify any instances of bullying or retaliation. (Doc. # 75-15 at 4-8). On June 24, 2022, Ms. Alford received a corrective action for the May 2022 incident. (Doc. # 72-10; Doc. 72-21 at ¶¶ 9-12). After the June 2022 corrective action, Ms. Alford and Ms. Iglesias had a conversation in which they discussed their issues and "moved forward." (Doc. # 72-2 at 170:2-25). Ms. Alford did not have any conflict with Ms. Iglesias for approximately one year and a half. (Id. at 170:2-171:7).

In fall 2023, Ms. Iglesias "issued Ms. Alford an annual written performance evaluation," which stated that Ms. Alford and Ms. Iglesias had "an in-person performance discussion" on November 5, 2023. (Doc. # 72-21 at ¶ 17). On December 17, 2023, Ms. Alford complained to HR that the evaluation inaccurately stated that she and Ms. Iglesias had an in-person conversation. (Doc. # 72-20 at ¶ 13). "Separately, Ms.

4

Alford also complained that Ms. Iglesias treated her 'differently' from other PRNs when Ms. Iglesias: (1) warned Ms. Alford that she would be removed from the schedule if she failed to complete her overdue [AdventHealth Learning Network trainings],and (2) made her sit with Ms. Hammond for training on an updated part of the initial evaluation within the electronic health record software called EPIC." (Id. at ¶ 14). Regional Employee Relations Specialist Telia Dowdell scheduled a meeting with Ms. Alford to discuss her complaints after the holidays. (Id. at ¶¶ 1, 14).

On January 4, 2024, Ms. Alford sarcastically told a coworker that she was going to quit. (Doc. # 72-2 at 196:7-197:7). Ms. Alford later overheard Ms. Iglesias discussing the comment with the department's scheduler. (Id. at 197:9-14; Doc. # 72-21 at ¶ 18). According to Ms. Alford, Ms. Iglesias stated that she wished Ms. Alford would quit because Ms. Iglesias "was so over her." (Doc. # 72-2 at 197:11-14). Ms. Alford approached the scheduler's cubicle and asked Ms. Iglesias why she was discussing her "personal business with the secretary." (Id. at 197:15-17). Ms. Iglesias said they were "talking about the schedules." (Id. at 197:17-18). Ms. Alford said they did not "have to go back and forth" and that she would "just call HR." (Id. at 197:18-21). Ms. Iglesias told Ms. Alford to go upstairs and speak to HR in person.

(Id. at 197:21-24). Ms. Alford then "went to grab the phone to call" HR, but Ms. Iglesias "grabbed [her] arm and said, I told you to go upstairs." (Id. at 197:25-198:3). Ms. Iglesias "pushed [Ms. Alford] out of the way," repeating that Ms. Alford should go upstairs." (Id. at 198:4-7).[1] Ms. Iglesias then called security and asked them "to escort Ms. Alford to HR." (Doc. # 72-21 at ¶ 19). Ms. Alford reported the incident to HR. (Doc. # 72-22 at ¶ 6).

Employee Relations investigated Ms. Alford's claims regarding the January 4, 2024, incident. (Id. at ¶ 7). On January 17, 2024, Ms. Alford, Ms. Iglesias, Ms. Dowdell, and Human Resources Director Jasmine Ramnarine met to discuss Ms. Alford's complaints. (Doc. # 72-20 at ¶ 18; Doc. # 72-22 at ¶ 2). Ms. Alford was told that AdventHealth "could not substantiate her allegations that Ms. Iglesias had physically assaulted her." (Doc. # 72-20 at ¶ 18). However, AdventHealth proposed that Ms. Alford "address her work-related concerns directly with her immediate supervisor, Ms. Hammond, going forward to cut out any unnecessary contact with Ms. Iglesias"

---

[1] Ms. Iglesias disputes Ms. Alford's characterization of the incident. According to Ms. Iglesias, she "told the scheduler something along the lines of that I wished Ms. Alford would talk to me personally if she was planning to quit." (Doc. # 72-21 at ¶ 18). Ms. Iglesias denies grabbing Ms. Alford's arm and claims that Ms. Alford "push[ed] her from behind to reach the scheduler's desk phone." (Id. at ¶ 19).

and to involve Ms. Hammond or HR if Ms. Alford "needed to address something with Ms. Iglesias directly." (Id.). "As part of the meeting, it was determined that Ms. Iglesias had made a mistake with respect to the November 5, 2023 performance discussion date but that the discussion itself had already taken place." (Id. at ¶ 19). "With respect to ALN trainings, it was determined that it was AdventHealth's standard procedure for employees to be taken off the schedule for not timely completing ALNs, and Ms. Alford was not an exception. With respect to EPIC trainings, it was determined they were arranged for Ms. Alford's benefit due to her limited availability and resulting limited opportunity to learn the IE update." (Id.).

In February 2024, Ms. Alford received a written "documented discussion" for: (1) clocking in prior to her scheduled start time, (2) failing to complete all her assignments, (3) failing to complete assignments correctly, (4) lack of communication, and (5) dishonesty about when she took her lunch break. (Doc. # 72-15).

Ms. Alford worked less than four shifts per month from February 2024 through May 2024. (Doc. # 72-17 at 1). Ms. Alford did not pick up additional shifts offered to her during that period. (Id.).

7

On May 17, 2024, Ms. Alford, Ms. Hammond, Ms. Iglesias, and Ms. Ramnarine met to discuss "the leadership's concerns around Ms. Alford's performance and responsiveness." (Doc. # 72-21 at ¶ 32). Ms. Alford did not work any shifts after May 17, 2024. (Doc. # 72-17 at 2).

On June 14, 2024, AdventHealth terminated Ms. Alford for failing to comply with Policy CW HR 244, which requires PRN employees "to work four (4) shifts in a four-week schedule period," since February 2024. (Id. at 1).

### D.    The EEOC and FCHR Charges

Ms. Alford filed a charge of discrimination with the EEOC and Florida Commission on Human Relations ("FCHR") on May 10, 2024. (Doc. # 72-18 at 1-2). The charge alleged only that AdventHealth retaliated against Ms. Alford for filing complaints about Ms. Iglesias. (Id.). Ms. Alford filed a second charge with the EEOC and FCHR on July 8, 2024, which elaborated on the retaliation alleged in the first charge (Doc. # 72-19 at 1-2). Neither charge asserted claims of race or sex discrimination or mentioned Ms. Alford's membership in any protected class. (Doc. # 72-18 at 1-2; Doc. # 72-19 at 1-2).

### E.    Procedural History

Ms. Alford's second amended complaint asserts five claims against AdventHealth: race-based discrimination in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.01 et seq., and 42 U.S.C. § 1981 (Count I); hostile work environment based on race in violation of Title VII, the FCRA, and Section 1981 (Count II); sex-based discrimination in violation of Title VII and the FCRA (Count III); hostile work environment based on sex in violation of Title VII and the FCRA (Count IV); and retaliation in violation of Title VII, the FCRA, and Section 1981 (Count V). (Doc. # 45).

The Court granted AdventHealth's motion to dismiss the claims brought pursuant to Title VII and the FCRA in Counts I through IV. (Doc. # 70). The Court dismissed with prejudice Counts I and II, to the extent they allege violations of Title VII and the FCRA, and Counts III and IV. (Id.). Thus, only Counts I and II, to the extent they allege violations of Section 1981, and Count V remain.

AdventHealth moves for summary judgment. (Doc. # 72). The Motion is fully briefed (Doc. ## 80, 84, 87) and is ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590,

10

593-94 (11th Cir. 1995) (quoting <u>Celotex Corp.</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

### A. <u>Hostile Work Environment in Violation of Section 1981</u>

AdventHealth argues that it is entitled to summary judgment on Count II as there is no evidence that the alleged harassment of Ms. Alford was based upon her race. (Doc. # 72 at 25). In response, Ms. Alford explicitly abandons her hostile work environment claim. (Doc. # 80 at 18).

11

As Ms. Alford has abandoned her hostile work environment claim, AdventHealth is granted summary judgment on Count II to the extent it alleges violation of Section 1981. See Ekokotu v. Fed. Exp. Corp., 523 F. App'x 629, 632 (11th Cir. 2013) (affirming grant of summary judgment for the defendant on national origin discrimination claims where plaintiff "explicitly and unequivocally disavowed them in response to [defendant's] motion for summary judgment").

### B.    Time-Barred Claims

AdventHealth argues that Ms. Alford's retaliation claims under Title VII and the FCRA are partially time-barred. (Doc. # 72 at 18-19). In response, Ms. Alford acknowledges that she "cannot recover for untimely events." (Doc. # 80 at 15). In its reply, AdventHealth argues for the first time that Ms. Alford cannot rely on "these time-barred events" to establish the prima facie elements of her Section 1981 race discrimination and retaliation claims. (Doc. # 84 at 3). Plaintiff does not address this argument in her sur-reply.

The Court agrees with AdventHealth as to the Title VII and FCRA retaliation claims but not as to the Section 1981 discrimination and retaliation claims.

### 1.    The Title VII and FCRA Retaliation Claims

"As a prerequisite to filing both a Title VII and a FCRA action, a plaintiff must exhaust all administrative remedies

12

by filing a timely charge with the appropriate agency." Jones v. Bank of Am., 985 F. Supp. 2d 1320, 1330 (M.D. Fla. 2013) (internal quotation marks omitted). "Since Florida is a deferral state, a charge must be filed within 300 days of the last discriminatory act." Davis v. Polk Cnty. Sheriff's Off., 170 F. App'x 598, 600 (11th Cir. 2005). "[U]nder the FCRA, an employee may file an administrative complaint with the Florida Civil Rights Commission within 365 days of the alleged violation." Essick v. Fid. Nat'l Info. Servs., Inc., No. 3:14-cv-949-MMH-J_K, 2016 WL 3615677, at *6 (M.D. Fla. July 6, 2016).

Here, Ms. Alford filed her first EEOC charge on May 10, 2024. (Doc. # 72-18). Accordingly, Ms. Alford's Title VII retaliation claim is time-barred to the extent it is based on any allegedly retaliatory actions that occurred before July 15, 2023. See O'Hara v. Univ. of W. Fla., 494 F. App'x 972, 973 (11th Cir. 2012) (affirming judgment dismissing Title VII claims as time-barred because the alleged misconduct occurred more than 300 days before plaintiff filed her charge of discrimination). Ms. Alford's FCRA retaliation claim cannot be based on allegedly retaliatory actions that occurred before May 11, 2023. See Bourne v. Sch. Bd. of Broward Cnty., 508 F. App'x 907, 909 (11th Cir. 2013) (affirming dismissal of FCRA claim as time barred where plaintiff did not file

13

charge of discrimination until 367 days after her last day of work).

### 2. The Section 1981 Discrimination and Retaliation Claims

As an initial matter, AdventHealth improperly raises its argument that Ms. Alford's Section 1981 discrimination and retaliation claims are partially time barred for the first time in its reply. WBY, Inc. v. DeKalb Cnty., Georgia, 695 F. App'x 486, 491–92 (11th Cir. 2017) ("Although Rutland did raise his current theory of probable cause in a reply brief in support of his motion for summary judgment, reply briefs are not a vehicle to present new arguments or theories.").

In any event, AdventHealth's argument is meritless because 42 U.S.C. § 1981 does not require claimants to go through the EEOC administrative process as a prerequisite of suit. Minnifield v. City of Birmingham Dep't of Police, 791 F. App'x 86, 88 n.1 (11th Cir. 2019); see also Mathis v. Leggett & Platt, 263 F. App'x 9, 12 (11th Cir. 2008) ("Mathis's claim of race discrimination under 42 U.S.C. § 1981 survives despite Mathis's untimely Title VII race discrimination charge because § 1981 actions are not subject to the administrative exhaustion requirement.").

14

C.   **Race-Based Discrimination in Violation of Section 1981**

Section 1981 "prohibit[s] intentional racial discrimination in employment contracts." Melton v. I-10 Truck Ctr. Inc, 166 F.4th 905, 912 (11th Cir. 2026). "An employee must prove '(1) intentional racial discrimination (2) that caused a contractual injury.'" Id. at 912-13 (quoting Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1296 (11th Cir. 2021)). "To establish intentional racial discrimination, an employee may rely on either direct evidence or circumstantial evidence." Id. at 913. Title VII claims and corresponding Section 1981 claims "have the same requirements of proof and utilize the same analytical framework." Smelter v. S. Home Care Servs. Inc., 904 F.3d 1276, 1284 n.1 (11th Cir. 2018).

"In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in McDonnell Douglas [Corp. v. Green, 411 U.S. 792, 800, (1973)]." Id. A plaintiff can also "demonstrate a convincing mosaic of circumstantial evidence that warrants an inference of intentional

15

discrimination." Id. (internal quotation marks omitted). Ms. Alford cannot succeed under either avenue.

### 1.   Ms. Alford Has Not Met Her Prima Facie Burden Under the *McDonnell Douglas* Framework

Under the McDonnell Douglas framework, the plaintiff has the initial burden of proving her prima facie case. McAlpin v. Sneads, 61 F.4th 916, 927 (11th Cir. 2023). To do so, the plaintiff must show that "(1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question, and (4) her employer treated similarly situated employees outside her class more favorably." Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 944 (11th Cir. 2023) (internal quotation marks omitted). "The prima facie showing entitles the plaintiff to a rebuttable presumption of intentional discrimination." Id. The burden then shifts to the defendant to rebut that presumption "by offering evidence of a valid, non-discriminatory justification for the adverse employment action." Id.

Ms. Alford belongs to a protected class. (Doc. # 72-2 at 186:11-12); Melton, 166 F.4th at 914. As Ms. Alford was discharged from a previously held position, she does not need to demonstrate she was qualified to perform the job in question. See Damon v. Fleming Supermarkets of Fla., Inc.,

16

196 F.3d 1354, 1360 (11th Cir. 1999) ("Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the McDonnell Douglas prong requiring proof of qualification." (internal quotation marks omitted)). Accordingly, to meet her prima facie burden, Ms. Alford must present evidence that she was subjected to an adverse employment action and that AdventHealth treated similarly situated employees outside her class more favorably.

### a.    Adverse Employment Actions

Claims of race discrimination under Section 1981 "require a showing that the employer subjected the employee to an adverse employment action." Davis v. Legal Servs. Ala., Inc., 19 F.4th 1261, 1265 (11th Cir. 2021) (internal quotation marks omitted). "When, as here, we are not talking about a hostile-work-environment claim, adverse employment actions include 'tangible employment actions,' which are those actions 'that affect continued employment or pay — things like terminations, demotions, suspensions without pay, and pay raises or cuts — as well as other things that are similarly significant standing alone.'" Id. at 1266 (quoting Monaghan v. Worldpay US, Inc., 955 F.3d 855, 860 (11th Cir. 2020)).

Ms. Alford claims that Ms. Iglesias subjected her to the following adverse employment actions: (1) the issuance of three write-ups and an allegedly falsified performance evaluation, (2) harassment and physical assault, (3) micromanagement and temporary relocation of her workstation, and (4) reduction in hours and termination. Each will be addressed in turn.

### i. The Write-Ups and the Performance Evaluation

Ms. Alford claims that she was "discipline[d]" for "requiring time off for family emergencies" in 2021 and 2022 and for "coming in too early" in 2024. (Doc. # 80 at 16). Ms. Alford does not elaborate on the "discipline" she received. However, it appears Ms. Alford is referring to the following documents: (1) the July 2021 corrective action she received for failing to work a scheduled shift, (2) the June 2022 corrective action she received for leaving a shift early, and (3) the February 2024 documented discussion she received for, among other things, clocking in before the start of her shifts. (Doc. # 80 at 9-11 ¶¶ 5-7, 10; 13 ¶ 16).

"The reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result." Summerlin v. M&H Valve Co., 167 F. App'x 93, 97 (11th Cir. 2006). "[M]emoranda of reprimand

18

or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions." Barnett v. Athens Reg'l Med. Ctr. Inc., 550 F. App'x 711, 713 (11th Cir. 2013) (quoting Davis v. Town of Lake Park, 245 F.3d 1232, 1236 (11th Cir. 2001)).

Here, Ms. Alford does not allege that the corrective actions or documented discussion had any effect on her employment. Therefore, even if these documents are properly deemed reprimands or "discipline," Ms. Alford has not established they are adverse employment actions. See Barnett, 550 F. App'x at 713 ("Barnett has failed to establish his *prima facie* case of discrimination because he was not subjected to an adverse employment action. The written reprimands and negative performance review had no effect on Barnett's employment."); Summerlin, 167 F. App'x at 97 (finding that written reprimand was not an adverse employment action as plaintiff did not allege that it "affected any important condition of his employment, such as salary, benefits, title, or job duties").

Ms. Alford further contends that the allegedly falsified performance evaluation is an adverse employment action. (Doc. # 80 at 16). However, Ms. Alford does not allege that the evaluation impacted any condition of her employment. Rather,

19

Ms. Alford acknowledges that the performance review was positive. (Doc. # 72-2 at 212:2-7; Doc. # 80 at 12 ¶ 15). Accordingly, Ms. Alford has not demonstrated that the allegedly false statement in the performance review is an adverse employment action. See Lamont v. City of Albany, No. 1:12-CV-82 WLS, 2015 WL 93874, at *10 (M.D. Ga. Jan. 7, 2015) ("[R]epeated false accusations alone, without accompanying negative employment consequences, are not adverse employment actions."); Soloski v. Adams, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009) ("False accusations without negative employment consequences are not employment decisions actionable under Title VII.").

### ii.  Harassment and Physical Assault

Ms. Alford claims that she was "harassed about requiring time off for family emergencies" in July 2021 and May 2022. (Doc. # 80 at 16). As Ms. Alford does not provide details of the alleged harassment, the nature of Ms. Alford's contention is unclear. Yet, Ms. Alford's response only describes one incident which could be considered harassment during this period: when Ms. Iglesias stated that Ms. Alford's job would be in jeopardy if she did not come in as scheduled in July 2021. (Id. at 9-10 ¶ 5). Ms. Alford also alleges that Ms. Iglesias "harassed her and physically assaulted her" on January 4, 2024. (Id. at 16).

"Harassment and hostility are not, by themselves, adverse employment actions." Muse v. Jax 02 LLC, No. 3:25-cv-1095-WWB-LLL, 2026 WL 776165, at *3 (M.D. Fla. Mar. 19, 2026); see Salyer v. AmSouth Bank, No. 8:04-cv-2543-EAK-MAP, 2007 WL 9723547, at *16 (M.D. Fla. Apr. 18, 2007) ("[O]stracism and hostility by a supervisor is not an adverse employment action."). "Indeed, hostile work environment, discrimination, and retaliation claims are each founded on a separate transaction or occurrence and require the plaintiff to establish different facts." Muse, 2026 WL 776165, at *3 (internal quotation marks omitted). "When an employee complains of 'harassment' by a supervisor, that claim is actionable only if it rises to the level of a hostile work environment, which requires 'proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Amos v. Mobile Cnty. Health Dep't, 767 F. Supp. 2d 1257, 1272 (S.D. Ala. 2011), aff'd, 460 F. App'x 893 (11th Cir. 2012) (quoting Miller v. Kenworth of Dothan Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)).

Here, Ms. Alford has abandoned her hostile work environment claim and does not contend that the alleged harassment and physical assault "rose to the level of a

21

hostile work environment." Amos, 767 F. Supp. 2d at 1272. Therefore, these incidents cannot be considered adverse employment actions. See Id. ("Amos has made no attempt to demonstrate that Stiegler's treatment of her rose to the level of a hostile work environment. Consequently, it cannot be considered an adverse employment action.").

In any event, Ms. Alford does not allege that Ms. Iglesias's statement that Ms. Alford's job was in jeopardy had any effect on her employment. See Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010) ("The only alleged discrimination about which Howard complained was Krzastek's message threatening that Howard's job was in jeopardy. An allegation such as this falls well short of an adverse action."); Mistretta v. Volusia Cnty. Dep't of Corr., 61 F. Supp. 2d 1255, 1260 (M.D. Fla. 1999) ("[T]hreats of termination do not constitute adverse employment actions."). Ms. Alford further has not claimed that the alleged physical altercation had a tangible effect on her employment. See McNichols v. Miami-Dade Cnty., No. 02-23034-CIV, 2006 WL 1104336, at *11 (S.D. Fla. Mar. 24, 2006) ("McNichols further alleged in her second EEOC charge that in retaliation for her filing her first EEOC charge: 1) her assigned work truck was vandalized; 2) she was intimidated; and 3) she was pushed. These allegations do not establish adverse employment

22

actions."); Smiley v. Jekyll Island State Park Auth., 12 F. Supp. 2d 1377, 1382 (S.D. Ga. 1998) ("Plaintiff's allegations that Jeffries slapped him, verbally abused him, criticized his job performance and demanded a doctor's excuse are insufficient for the Court to find that he suffered any adverse employment action."). Accordingly, even if Ms. Alford's claims that Ms. Iglesias threatened her job and grabbed and pushed her are not deemed acts of harassment and hostility that must rise to the level of a hostile work environment, Ms. Alford still has not demonstrated that they are adverse employment actions.

### iii. Micromanagement and Temporary Relocation of Workstation

Ms. Alford claims that she was micromanaged by being "forced to sit with her immediate supervisor, [Ms.] Hammond, or another employee designated by [Ms.] Iglesias," while Ms. Hammond "was ordered to document everything [Ms. Alford] did during her shift." (Doc. # 80 at 16-17). However, heightened scrutiny of an employee's work does not constitute an adverse employment action. See Tamez v. A/C Storage Place, Ltd., No. 6:15-cv-1541-CEM-TBS, 2017 WL 10059003, at *6 (M.D. Fla. June 20, 2017) ("Plaintiff argues that Vance 'micromanaged' her by instructing others to double check Plaintiff's work, particularly her banking and deposit related work. Such

23

heightened scrutiny does not constitute an adverse employment action."); <u>Lamont v. City of Albany</u>, No. 1:12-CV-82 WLS, 2015 WL 93874, at *10 (M.D. Ga. Jan. 7, 2015) ("[T]he Court finds that increased supervision and monitoring of LaMont's work is not an adverse employment action."). Further, "[m]ere inconveniences, including dissatisfaction with work spaces, do not constitute adverse employment actions." <u>Scotton v. Nicholson</u>, No. 8:04-cv-1440-JDW-EAJ, 2006 WL 8429880, at *15 (M.D. Fla. Mar. 22, 2006) (internal quotation marks omitted).

As Ms. Alford has not alleged any tangible, negative effect on her employment other than increased supervision and a temporary office relocation, she has not demonstrated that she suffered adverse employment actions. <u>See</u> <u>Id.</u> ("The location . . . of an office does not meet the requisite level of substantiality to be considered adverse absent some other tangible, negative effect on Plaintiff's employment."); <u>Arora v. Miami-Dade Cnty., Fla.</u>, No. 23-cv-20962, 2024 WL 4286220, at *8 (S.D. Fla. Sept. 25, 2024) ("In short, Mr. Arora's claim that he suffered an adverse employment action with regard to Ms. Johnson's increased supervision and scrutiny of his daily tasks falls far short of serious and material changes in the terms and conditions of employment.").

24

### iv.  <u>Reduction in Hours and Termination</u>

Ms. Alford alleges that she suffered an adverse employment action when Ms. Iglesias "refused to schedule [Ms. Alford] for shifts on dates which she was available, although she provided her availability well in advance of the schedule being posted." (Doc. # 80 at 17). Ms. Alford claims that, despite timely submitting her availability, she was not scheduled for any shifts in March or June 2024 and was only scheduled for two shifts in April 2024. (Doc. # 80 at 13-15 ¶¶ 19-23; Doc. # 72-2 at 90:7-20; Doc. # 75-7 at ¶¶ 34-35, 37, 40). Ms. Alford further alleges that she "was terminated for a pretextual reason, that she had violated the PRN policy of <u>working</u> 4 shifts per month." (Doc. # 80 at 17) (emphasis in original); <u>see</u> (Doc. # 75-7 at ¶¶ 42, 44) (asserting that Ms. Iglesias mischaracterized AdventHealth's "PRN attendance policy" in the June 2024 corrective action issued in connection with Ms. Alford's termination).

"A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action." <u>Cotton v. Cracker Barrel Old Country Store, Inc.</u>, 434 F.3d 1227, 1231 (11th Cir. 2006). Termination also is an adverse employment action. <u>Melton</u>, 166 F.4th at 914. Accordingly, Ms. Alford has sufficiently alleged that she

suffered an adverse employment action by having her hours reduced and, ultimately, by being terminated.

### b. **Treating Similarly Situated Employees More Favorably**

A plaintiff meets her prima facie burden of demonstrating that her employer treated similarly situated employees outside her class more favorably "when the plaintiff presents evidence of a comparator — someone who is similarly situated in all material respects." <u>Tynes</u>, 88 F.4th at 944 (internal quotation marks omitted). "Generally, this means that a comparator will (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; and (4) share the plaintiff's employment or disciplinary history." <u>Phillips v. Legacy Cabinets</u>, 87 F.4th 1313, 1322 (11th Cir. 2023). Ms. Alford has not met her burden.

In her response, Ms. Alford claims that Ms. Iglesias refused to schedule her "for shifts on dates which she was available," but "did not refuse to schedule non-black employees for all dates for which they indicated availability." (Doc. # 80 at 17). Yet Ms. Alford does not cite any record evidence in support. In any event, a

conclusory allegation that Ms. Iglesias did not refuse to schedule unnamed non-Black employees on dates they were available is not sufficient. See Jones v. Saugahatchee Country Club, No. 3:23-CV-34-ECM, 2026 WL 734415, at *3 (M.D. Ala. Mar. 16, 2026) ("Her suggestion that unnamed white employees 'were treated more favorably' is not enough."); Wells v. Miami Dade Cnty., No. 15-22431-CIV, 2016 WL 7492560, at *6 n.7 (S.D. Fla. Dec. 30, 2016) ("Wells' discrimination claim lacks merit also because she has not identified a similarly situated, non-Black employee who received more favorable treatment than she received."). Further, Ms. Alford does not even allege that any similarly situated employees who failed to work at least four shifts per month were not terminated.

Accordingly, Ms. Alford has not met her prima facie burden under the McDonnell Douglas framework. See Adewumi v. Wellstar Med. Grp., No. 24-12243, 2025 WL 831584, at *6 (11th Cir. Mar. 17, 2025) (finding that plaintiff failed to meet his initial burden under the McDonnell Douglas framework as he "failed to establish a proper comparator"); Moultrie v. Georgia Dep't of Corr., 703 F. App'x 900, 907 (11th Cir. 2017) (same).

27

## 2. **Ms. Alford Has Not Presented a Convincing Mosaic of Circumstantial Evidence**

"Aside from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022) (internal quotation marks omitted). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks omitted). "A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis, 934 F.3d at 1185 (internal quotation marks omitted).

Ms. Alford argues that she has presented a convincing mosaic of circumstantial evidence establishing discriminatory

28

intent. (Doc. # 80 at 17-18). Specifically, Ms. Alford alleges as follows:

> [Ms. Alford] was reliable, but harassed about taking leave for family emergencies, while white co-workers called out, arrived late or left early with no consequences. When [Ms. Alford] reported [Ms.] Iglesias to HR for misconduct, [Ms.] Iglesias issued her discipline, physically assaulted her and forced her supervisor to babysit and monitor her while she worked. After the January 2024 meeting with HR and [Ms.] Iglesias to report [Ms.] Iglesias for falsifying documents and for physically assaulting her, [Ms.] Iglesias refused to schedule [Ms. Alford] for shifts which she reported her availability. [Ms.] Iglesias then used [Ms. Alford's] lack of shifts to terminate her.

(Id. at 17).

"While evidence of 'systematically better treatment of similarly situated employees' can support an inference of discriminatory intent," here, Ms. Alford has not presented evidence that similarly situated non-Black employees routinely received better treatment. Adewumi, 2025 WL 831584, at *8 (quoting Jenkins, 26 F.4th 1250). Ms. Alford's circumstantial evidence, viewed as a whole, is insufficient to survive summary judgment under the convincing mosaic approach.

Ms. Alford testified at her deposition that unnamed white employees called out of work on short notice, but she did not know whether they were disciplined. (Doc. # 72-2 at 135:17-141:10). However, in her affidavit, Ms. Alford claimed

29

that unnamed "[n]on-Black employees were not subjected to discipline for their failure to report for scheduled shifts and were allowed to call out at the last minute without consequences." (Doc. # 75-7 at ¶ 12). Ms. Alford further testified that non-Black employees Alicia Williams, Thuy Kimbal, and Karen Schneider were allowed to leave work early to handle personal appointments. (Doc. # 72-2 at 287:3-288:5). In her affidavit, Ms. Alford identified only Ms. Williams, Ms. Kimbal, and Amy Crow as employees who were permitted to leave early. (Doc. # 75-7 at ¶ 15). Ms. Alford averred that the following non-Black employees "under the charge of [Ms.] Iglesias were not disciplined for arriving to work early": Ms. Hammond, Susan Beathler, McKenna Welton-Rabe, Ms. Williams, Darla Durrett, Wilda Neifa, Ms. Kimbal, Julie Hatchett, Cynthia Serota, and Sara Resch. (Id. at ¶ 32). Finally, Ms. Alford averred that other "non-black employees, including Leah Rabel, were regularly tardy for shifts but received no discipline for the misconduct." (Id.).

"[C]onclusory allegations have no probative value at summary judgment unless supported by specific evidence." Kelley v. Howden, No. 21-13573, 2022 WL 17259720, at *1 (11th Cir. Nov. 29, 2022); Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). Here, Ms. Alford did not explain the circumstances of any of these alleged instances of

30

disparate treatment or otherwise provide details that would support a finding that similarly situated non-Black employees were treated better than she was. Accordingly, her conclusory allegations that certain named and unnamed non-Black employees were allowed to call out on short notice, leave early, and arrive early or late, without more, do not raise a reasonable inference that AdventHealth intentionally discriminated against her. See Hill v. Oil Dri Corp. of Georgia, 198 F. App'x 852, 858 (11th Cir. 2006) ("Plaintiffs' EEOC affidavits were too conclusory and lacking in specific facts to create genuine issues of material fact as to . . . whether white employees were similarly situated.").

In any event, even if Ms. Alford's allegations were not conclusory, they would still be insufficient as she failed to establish that any of the non-Black employees were similarly situated to her. See Adewumi, 2025 WL 831584, at *8 (holding that plaintiff's allegations that his supervisor "micromanaged him and subjected his medical errors to more scrutiny than his white colleagues" did not establish systemically better treatment of similarly situated employees as plaintiff "failed to present evidence of how his white counterparts within the practice group were managed or peer reviewed"); Robert v. City of Boca Raton, No. 21-13779, 2024 WL 3066604, at *5 (11th Cir. June 20, 2024) (holding that

circumstantial evidence, including that two dissimilar employees were not terminated or asked to resign, was "insufficient for a reasonable jury to infer intentional race discrimination").

While it is apparent that Ms. Alford had a contentious working relationship with Ms. Iglesias, Ms. Alford has not explained why this suggests Ms. Iglesias had discriminatory intent. As previously discussed, Ms. Alford has not offered any record support for her conclusory claim that Ms. Iglesias refused to schedule Ms. Alford "for shifts on dates which she was available" but "did not refuse to schedule non-black employees for all dates for which they indicated availability." (Doc. # 80 at 17). Accordingly, Ms. Alford has not presented evidence suggesting discriminatory intent. See Hawkins v. Ceco Corp., 883 F.2d 977, 986 (11th Cir. 1989) ("Hawkins presented evidence that Rascoe did not like him, but a dislike alone is not evidence of racial discrimination."); Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1327-28 (N.D. Ga. 2001) ("A mere personality clash among co-workers, no matter how severe, is not grounds for a Title VII discrimination complaint.").

Finally, Ms. Alford does not offer any support for her assertion that she "was terminated for a pretextual reason." (Doc. # 80 at 7). Even crediting Ms. Alford's claim that Ms.

Iglesias required PRN employees to follow a staffing policy more stringent than AdventHealth's written policy (Doc. # 75-7 at ¶ 42), Ms. Alford does not allege that Ms. Iglesias only required Black PRN employees to work four shifts per month or that only Black PRN employees were disciplined for failing to work the minimum amount of shifts. In contrast, AdventHealth has identified 12 non-Black PRN employees who, like Ms. Alford, were terminated in 2024 and 2025 for "failure to keep the four-shifts-per-month schedule." (Doc. # 72-22 at ¶ 13). Accordingly, Ms. Alford has not presented any evidence that AdventHealth's decision to terminate her was pretextual. See Connell v. Postmaster Gen., U.S. Postal Serv., 518 F. App'x 702 (11th Cir. 2013) (affirming summary judgment in favor of defendant where plaintiff "failed to present evidence that the legitimate reasons offered for her termination were pretextual"); Decoste v. City of Boynton Beach, 818 F. Supp. 3d 1360, 1377 (S.D. Fla. 2026) ("Decoste offers no evidence that shows that the City's decision to terminate her following the Final Report was pretext, which is also fatal to her convincing mosaic framework.").

In sum, Ms. Alford has not presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith, 644

33

F.3d at 1328. AdventHealth is granted summary judgment on Count I to the extent it alleges violation of Section 1981.

D.  **Retaliation in Violation of Title VII, the FCRA, and Section 1981**

"Title VII prohibits retaliation against an employee because that employee has 'opposed any practice made an unlawful employment practice by [Title VII].'" Gant v. Kash'n Karry Food Stores, Inc., 390 F. App'x 943, 945 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e-3(a)). The FCRA and Section 1981 also prohibit employers from retaliating against employees who engage in protected conduct. Michaels v. Sasser's Glass Works Inc., No. 23-11166, 2025 WL 588648, at *2-3 (11th Cir. Feb. 24, 2025). "Claims under both § 1981 and the FCRA are analyzed under the same framework as Title VII." Gant, 390 F. App'x at 945. "Claims of retaliation can be supported with either direct or circumstantial evidence." Lapham v. Walgreen Co., 88 F.4th 879, 889 (11th Cir. 2023). Where, as in the instant case, "a plaintiff alleging retaliation presents only circumstantial evidence and no direct evidence," courts apply the McDonnell Douglas framework. Id.

To meet her initial burden of proving a prima facie case, the plaintiff must show that: (1) she "engaged in statutorily protected expression"; (2) she "suffered an adverse

34

employment action; and (3) there is some causal relation between the two events." McAlpin, 61 F.4th at 927 (internal quotation marks omitted). "If the plaintiff cannot establish a prima facie case, she does not automatically lose on summary judgment." Ismael v. Roundtree, 161 F.4th 752, 764 (11th Cir. 2025). Rather, a court "should advance directly to the convincing mosaic inquiry." Id. at 765. Ms. Alford cannot defeat summary judgment under either test.

### 1.    Ms. Alford Has Not Established a Prima Facie Case

Ms. Alford alleges that she engaged in the following protected activity prior to her termination: (1) making complaints to HR in June 2022 and December 2023 and (2) filing an EEOC charge of discrimination in May 2024. (Doc. # 80 at 18-19). AdventHealth does not dispute that these actions are protected activity. Accordingly, the Court will assume, without deciding, that Ms. Alford has met her prima facie burden of establishing that she engaged in protected activity.

With respect to the second prong, Ms. Alford claims that she suffered a materially adverse employment action as she "was fired allegedly for failing to work a minimum number of shifts, an impossibility when [Ms.] Iglesias refused to schedule her to work." (Doc. # 80 at 20). A reduction in hours

35

that results in a loss of pay is a materially adverse action. Jones v. Aaron's Inc., 748 F. App'x 907, 917 (11th Cir. 2018). "Termination is a materially adverse action." Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924 (11th Cir. 2018). Therefore, Ms. Alford has met her prima facie burden in this regard.

Finally, Ms. Alford alleges that there is a causal connection between her protected conduct and the adverse action as she "made multiple verbal and written complaints about [Ms.] Iglesias who then disciplined and fired her." (Doc. # 80 at 20).

"To establish a causal link for purposes of the third element, a plaintiff need only demonstrate that the protected activity and the adverse action were not wholly unrelated." Matamoros v. Broward Sheriff's Off., 2 F.4th 1329, 1336 (11th Cir. 2021) (internal quotation marks omitted). "A plaintiff makes this showing if she provides sufficient evidence that the decisionmaker became aware of the protected conduct and that there was a close temporal proximity between this awareness and the adverse action." Id. "If there is a delay of more than three months between the two events, then the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation." Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir.

36

2011). "Moreover, there is no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening act of misconduct." Brisk v. Shoreline Found., Inc., 654 F. App'x 415, 417 (11th Cir. 2016).

Although there is a close proximity between the May 2024 EEOC charge and Ms. Alford's termination, it is insufficient to demonstrate a causal connection because there is no evidence that Ms. Iglesias knew of the charge while Ms. Alford was employed at AdventHealth. See Matamoros, 2 F.4th at 1337 ("Without some showing of awareness, the causal chain falls apart and the claim fails."). Therefore, Ms. Alford must establish a causal connection between her June 2022 and December 2023 HR complaints and the alleged retaliation.

Ms. Alford does not allege that Ms. Iglesias refused to schedule her on her available dates prior to March 2024. (Doc. # 80 at 13-15 ¶¶ 19-23; Doc. # 72-2 at 90:7-20; Doc. # 75-7 at ¶¶ 34-35, 37, 40). Accordingly, the nearly two-year gap between Ms. Alford's June 2022 HR complaint and the alleged retaliation is insufficient, in and of itself, to show a causal connection. Henderson, 442 F. App'x at 506.

Regarding the December 2023 HR complaint, Ms. Alford alleges that her reduction in hours began slightly more than two months later, when she sent her availability for March

37

2024 but was told that she "was not needed on any of [her] available days." (Doc. # 75-7 at ¶¶ 23, 34). Two months may be a sufficiently close temporal proximity to establish causation. See Henderson, 442 F. App'x at 506 (stating that a delay of more than three months is not sufficiently close proximity to establish causation, without more). However, Ms. Alford's intervening misconduct severed any causal connection between the complaint and the alleged retaliation. Brisk, 654 F. App'x at 417.

It is undisputed that Ms. Alford did not comply with the PRN staffing policy enforced by AdventHealth from February 2024 through May 2024 by failing to work four shifts per month. (Doc. # 72-22 at ¶¶ 11-13). Ms. Alford merely claims that, based on her interpretation of AdventHealth's written policy, she only needed to provide four dates per month that she was available to work, which she did. (Doc. # 75-7 at ¶¶ 44-45). However, Ms. Alford's personal interpretation of the language of the written policy is irrelevant. She does not dispute that AdventHealth interpreted the policy as requiring PRN employees to work four shifts per month and that AdventHealth enforced the policy accordingly. (Doc. # 72-21 at ¶ 29; Doc.# 72-22 ¶¶ 11-13).

Further, Ms. Alford does not offer any record support for her claim that Ms. Iglesias refused to schedule her "for

38

shifts on dates which she was available." (Doc. # 80 at 17). The fact that Ms. Alford was not scheduled on all her available dates is not evidence that PRN employees such as Ms. Alford were needed on such dates and that Ms. Iglesias intentionally chose not to schedule Ms. Alford. Moreover, Ms. Alford does not dispute that AdventHealth offered her additional shifts to pick up from February 2024 through May 2024 so that she could comply with the four-shifts-per-month-requirement, which she declined. (Doc. # 72-17 at 1); See (Doc. # 72-2 at 102:24-103:7) (explaining that Ms. Alford did not pick up additional shifts offered to her in 2024 because of family and personal obligations). Without record support, the Court cannot credit Ms. Alford's conclusory claim that Ms. Iglesias intentionally refused to schedule her.

Due to Ms. Alford's intervening failure to work the required number of shifts, she has not demonstrated a causal connection between her protected activity and the adverse action. See Brisk, 654 F. App'x at 417 ("With regard to Brisk's retaliation claim based on his termination, the district court correctly granted summary judgment because there was no causal connection between the protected conduct — Brisk taking FMLA leave — and the adverse event, termination, when the temporal proximity of four months was tenuous and there was an intervening cause of poor work

39

performance."); <u>Henderson</u>, 442 F. App'x at 507 ("Henderson's falsification of his time card was an intervening act of misconduct that diminished any inference of causation that may have arisen out of the temporal proximity between his September 14 interview and his termination."). Accordingly, Ms. Alford has not established a prima facie retaliation claim.

### 2. **Ms. Alford Has Not Presented a Convincing Mosaic of Circumstantial Evidence**

Ms. Alford also "fails to establish a convincing mosaic of circumstantial evidence to create a triable issue as to" AdventHealth's retaliatory intent for any of her retaliation claims. <u>Nevins v. DCH Health Sys.</u>, No. 25-12124, 2026 WL 1103517, at *5 (11th Cir. Apr. 23, 2026). Ms. Alford has not presented any evidence in support of her conclusory claim that she "was regularly denied the opportunity to work . . . in retaliation for [her] protected activity." (Doc. # 75-7 at ¶ 45). Ms. Alford also has not shown that AdventHealth's stated reasons for terminating her were pretextual, such as by revealing "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1348 (11th

40

Cir. 2007) (internal quotation marks omitted). Viewing the record cumulatively and in the light most favorable to Ms. Alford, the "shards of evidence do not come together to produce an image of retaliation." Johnson v. Miami-Dade Cnty., 169 F.4th 1301, 1311 (11th Cir. 2026). Therefore, "there is no evidence that would allow a jury to infer intentional retaliation by" AdventHealth. Nevins, 2026 WL 1103517, at *5.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant's Motion for Summary Judgment (Doc. # 72) is **GRANTED.**

(2) Summary judgment in favor of Defendant is granted on Counts I and II, to the extent they allege violations of Section 1981, and Count V.

(3) The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

(4) Thereafter, the Clerk is directed to cancel all hearings, the trial scheduled for August 2026, terminate all deadlines, and **CLOSE** this case.

41

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>4th</u>

day of June, 2026.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE